IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MARK ROSSETTI, MATTHEW ROSSETTI, and JESSICA ROSSETTI, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | No. 07 C 4907 |
| SHAWN WASCHER, BRIAN MATICHAK, PATRICK BLATTI, JASON BLATTI, CITY OF JOLIET, a municipal corporation, LINDSEY HEAVENER, LESLIE O'CONNOR, and GORDON CORP, | ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

# OPINION AND ORDER

## I. Background

Crude statements and ongoing cell phone calls related to a mutual female friend led to blows between two young men and later a confrontation and threats of a beating. Following a 911 call and a police investigation, plaintiff Matthew Rossetti ("Matt") was arrested and charged with aggravated battery. Defendant Jason Blatti ("Jason"), the other party in the fight, voluntarily went to a hospital for treatment of visible injuries.

Matt, his father Mark Rossetti ("Mark"), and his sister Jessica Rossetti

sued six police officers, including Jason's father Patrick Blatti ("Patrick").

Plaintiffs claim a false arrest of Matt in order to cover up the offenses of Jason

during both the initial fight and the subsequent confrontation when threats were

made. Matt was tried and acquitted of a single misdemeanor count of battery.

Defendants contend that they were particularly careful in their

investigation of the fight and threats, including involving supervisors, because the

son of a police officer was involved in the incidents.

The case is before the court on defendants' motions for summary

judgment.

In addition to the Blattis, the City of Joliet and members of its Police

Department are named as defendants.[1] Defendants Brian Matichak and Sergeant

Leslie O'Connor were the two officers who came to the Rossetti residence in

response to a 911 call. On the day at issue, O'Connor was Matichak's supervisor.

Lindsey Heavener was a Sergeant; on the day in question, he was Patrick's

---

[1]The defendants other than Jason will be collectively referred to as the "Joliet Defendants." The Joliet Defendants are represented by the same counsel. Jason is represented by his own counsel and has filed separate motions and briefs. Both sets of defendants, though, join in each others' arguments.

supervisor. Patrick's initial report of the incident was made to Heavener.

Defendant Gordon Corp is a Lieutenant. He was the Watch Commander at the

time the incident was reported and investigated. Defendant Shawn Wascher was

the officer sent to the hospital to interview Jason. Gina Vidano, the mutual friend

who was present during the fight, was also interviewed at the hospital.

Plaintiffs' Third Amended Complaint contains seven counts, but

Count VI was previously dismissed on a Rule 12(b)(6) motion. *See **Rossetti v.**

**Wascher***, 2009 WL 2497671 *3 (N.D. Ill. Aug. 14, 2009).[2] Count I is a claim

pursuant to 42 U.S.C. § 1983 that defendants,[3] in violation of the First

Amendment, conspired to retaliate against all three plaintiffs for initiating contact

with 911. Count II is a § 1983 claim by Matt that defendants conspired together in

subjecting him to false arrest in violation of the Fourth Amendment. Count III is a

§ 1983 Equal Protection class of one claim by Matt alleging all defendants

conspired together to violate his rights. Count IV is a state law malicious

prosecution and conspiracy claim by Matt against all defendants. Count V is

---

[2]This case was previously assigned to another judge who has since
retired.

[3]Defendant City of Joliet is not named in any of the substantive counts.
It is only named in Count VII as being liable for indemnifying the defendant
officers pursuant to 745 ILCS 10/9-101.

a § 1983 due process claim by Matt against all defendants contending they conspired "to withhold, conceal and/or destroy evidence that tended to negate the Plaintiff's guilt for the crime with which he was charged, and/or to fabricate evidence that incriminated the Plaintiff." 3d Am. Compl. ¶46.

## II. Summary Judgment Standards

On a motion for summary judgment, the entire record is considered with all reasonable inferences drawn in favor of the nonmovant and all factual disputes resolved in favor of the nonmovant. *Crawford v. Metro. Gov't of Nashville & Davidson County, Tenn.*, 129 S. Ct. 846, 849 (2009); *Stokes v. Bd. of Educ. of City of Chicago*, 599 F.3d 617, 619 (7th Cir. 2010); *Knight v. Wiseman*, 590 F.3d 458, 462 (7th Cir. 2009). The burden of establishing a lack of any genuine issue of material fact rests on the movant. *Delta Consulting Group, Inc. v. R. Randle Constr., Inc.*, 554 F.3d 1133, 1137 (7th Cir. 2009); *Hicks v. Midwest Transit, Inc.*, 500 F.3d 647, 651 (7th Cir. 2007); *Outlaw v. Newkirk*, 259 F.3d 833, 837 (7th Cir. 2001). The nonmovants, however, must make a showing sufficient to establish any essential element for which they will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Nat'l Athletic Sportswear, Inc. v. Westfield Ins. Co.*, 528 F.3d 508, 512 (7th Cir. 2008); *Hicks*,

500 F.3d at 651. The movant need not provide affidavits or deposition testimony showing the nonexistence of such essential elements. *Celotex*, 477 U.S. at 324; *Freundt v. Allied Tube & Conduit Corp.*, 2007 WL 4219417 *2 (N.D. Ill. Nov. 29, 2007); *O'Brien v. Encotech Constr.*, 2004 WL 609798 *1 (N.D. Ill. March 23, 2004). Also, it is not sufficient to show evidence of purportedly disputed facts if those facts are not plausible in light of the entire record. *See Lorillard Tobacco Co. v. A & E Oil, Inc.*, 503 F.3d 588, 594-95 (7th Cir. 2007); *Yasak v. Ret. Bd. of Policemen's Annuity & Benefit Fund of Chicago*, 357 F.3d 677, 679 (7th Cir. 2004); *NLFC, Inc. v. Devcom Mid-America, Inc.*, 45 F.3d 231, 236 (7th Cir. 1995); *Covalt v. Carey Canada, Inc.*, 950 F.2d 481, 485 (7th Cir. 1991); *Collins v. Associated Pathologists, Ltd.*, 844 F.2d 473, 476-77 (7th Cir. 1988); *Freundt*, 2007 WL 4219417 at *2. As the Seventh Circuit has summarized:

> The party moving for summary judgment carries the initial burden of production to identify "those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Logan v. Commercial Union Ins. Co.*, 96 F.3d 971, 978 (7th Cir. 1996) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548 (1986) (citation and internal quotation omitted)). The moving party may discharge this burden by "'showing'--that is, pointing out to the district

court--that there is an absence of evidence to support the nonmoving party's case." ***Celotex***, 477 U.S. at 325, 106 S. Ct. 2548. Once the moving party satisfies this burden, the nonmovant must "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). "The nonmovant must do more, however, than demonstrate some factual disagreement between the parties; the issue must be 'material.'" ***Logan***, 96 F.3d at 978. "Irrelevant or unnecessary facts do not preclude summary judgment even when they are in dispute." ***Id.*** (citation omitted). In determining whether the nonmovant has identified a "material" issue of fact for trial, we are guided by the applicable substantive law; "[o]nly disputes that could affect the outcome of the suit under governing law will properly preclude the entry of summary judgment." ***McGinn v. Burlington Northern R.R. Co.***, 102 F.3d 295, 298 (7th Cir. 1996) (citation omitted). Furthermore, a factual dispute is "genuine" for summary judgment purposes only when there is "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." ***Anderson v. Liberty Lobby, Inc.***, 477 U.S. 242, 249, 106 S. Ct. 2505 (1986). Hence, a "metaphysical doubt" regarding the existence of a genuine fact issue is not enough to stave off summary judgment, and "the nonmovant fails to demonstrate a genuine issue for trial 'where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party . . . .'" ***Logan***, 96 F.3d at 978 (quoting ***Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.***, 475 U.S. 574, 587, 106 S. Ct. 1348 (1986)).

***Outlaw***, 259 F.3d at 837.

Jason contends that plaintiffs' statement of additional facts ("PSAF") is argumentative and often unsupported by evidence. The Joliet Defendants also raise objections to the PSAF. The objections of both sets of defendants generally

lack merit. Regardless of whether any aspect of plaintiffs' Rule 56.1 statements is properly characterized as argument (plaintiffs contend they are not), each side's contentions have been considered in determining whether plaintiffs' or defendants' asserted facts are supported by sufficient evidence or any material fact is in issue.

### III. Statute of Limitations

The incidents at issue in this case began shortly before midnight on December 21, 2005 and ended with Matt's arrest early on the morning of December 22. Defendants Heavener, Corp, and O'Connor were not named as defendants until the Third Amended Complaint, which was filed on August 15, 2008. These three defendants contend all claims against them, except Count V, are untimely. The parties agree that a two-year limitation period applies to the Counts I through III § 1983 claims and a one-year limitation period applies to the Count IV state law claim against the officers. They also agree that, absent some form of tolling or estoppel, Counts I, II, and III would have accrued in December 2005, requiring that they be raised by December 2007, while the Count IV malicious prosecution claim would have accrued upon the December 2006 acquittal and also had to be filed by December 2007. The original complaint in this action was timely filed on August 30, 2007. The dispute is whether equitable

estoppel applies to extend the limitation period until the August 15, 2008 filing of an amended complaint adding the three supervisors as defendants.

Plaintiffs contend the supervisory defendants' full involvement in the claimed misconduct was intentionally concealed by the failure to complete adequate police reports and therefore their involvement in wrongdoing could not be discovered until less than two years before the Third Amended Complaint was filed. Defendants contend it is enough that their names were in reports and failure to bring a claim sooner was due to a lack of diligence. They also contend that discovery of such facts is not a basis for applying equitable estoppel or equitable tolling under Illinois law. The applicable limitation period, as well as any related tolling or estoppel doctrine, is governed by Illinois law. Illinois law applies both to the state law claim and the § 1983 claims, for which the statute of limitations is borrowed from state law. *See Parish v. City of Elkhart*, 614 F.3d 677, 679 (7th Cir. 2010); *Bontkowski v. Smith*, 305 F.3d 757, 762-63 (7th Cir. 2002); *Shelton v. Ruiz*, 2010 WL 3419710 *2 (N.D. Ill. Aug. 25, 2010); *Aleman v. Dart*, 2010 WL 502755 *3-4 (N.D. Ill. Feb. 9, 2010).

In response to the summary judgment motion, plaintiffs expressly disavow any reliance on Illinois's fraudulent concealment statute, 735 ILCS

5/13-215. They solely rely on the common law doctrine of equitable estoppel.

The burden is on plaintiffs to establish equitable estoppel by clear and convincing evidence. *Falcon Funding, LLC v. City of Elgin*, 399 Ill. App. 3d 142, 924 N.E.2d 1216, 1230 (2d Dist. 2010); *Jenkins v. Nat'l R.R. Passenger Corp.*, 2008 WL 2520414 *6 (N.D. Ill. June 20, 2008). "A party claiming estoppel must demonstrate that: (1) the other person misrepresented or concealed material facts; (2) the other person knew at the time he or she made the representations that they were untrue; (3) the party claiming estoppel did not know that the representations were untrue when they were made and when that party decided to act, or not, upon the representations; (4) the other person intended or reasonably expected that the party claiming estoppel would determine whether to act, or not, based upon the representations; (5) the party claiming estoppel reasonably relied upon the representations in good faith to his or her detriment; and (6) the party claiming estoppel would be prejudiced by his or her reliance on the representations if the other person is permitted to deny the truth thereof." *Koczor v. Melnyk*, ___ Ill. App. 3d ___, ___ N.E.2d ___, 2011 WL 341274 *5 (1st Dist. Jan. 28, 2011) (quoting *DeLuna v. Burciaga*, 223 Ill. 2d 49, 857 N.E.2d 229, 249 (2006)); *accord Mauer v. Rubin*, 401 Ill. App. 3d 630, 926 N.E.2d 947, 962-63 (1st Dist.

2010) (quoting *Turner v. Nama*, 294 Ill. App. 3d 19, 689 N.E.2d 303, 308

(1st Dist. 1997)); *Jenkins*, 2008 WL 2520414 at *6 (quoting *Orlak v. Loyola*

*Univ. Health Sys.*, 228 Ill. 2d 1, 885 N.E.2d 999, 1011 (2007) (quoting *DeLuna*,

857 N.E.2d at 249)) . "[I]t is not necessary that the defendant intentionally

mislead or deceive the plaintiff, or even intend by its conduct to induce delay.

Rather, all that is necessary for invocation of the doctrine of equitable estoppel is

that the plaintiff reasonably rely on the defendant's conduct or representations in

forbearing suit." *Koczor*, *supra* (quoting *Jackson Jordan, Inc. v. Leydig, Voit &*

*Mayer*, 158 Ill. 2d 240, 633 N.E.2d 627, 632 (1994)); *Jenkins*, 2008 WL 2520414

at *6 (quoting *Orlak*, 885 N.E.2d at 1011). Equitable estoppel will not apply if

"the claimant discovers the fraudulent concealment, or should have discovered it

through ordinary diligence, and a reasonable time remains within the remaining

limitations period." *Mauer*, 926 N.E.2d at 963. *See also Kheirkhahvash v.*

*Baniassadi*, ___ Ill. App. 3d ___, ___ N.E.2d ___, 2011 WL 181436 *8 (1st Dist.

Jan. 13, 2011); *Jenkins*, 2008 WL 2520414 at *6.

Here, plaintiffs cannot dispute that Heavener, Corp, and O'Connor were

identified in the police reports as "Supervisor at Scene" and Heavener was also

listed as "Field Supervisor." Also O'Connor was at the Rossettis and interviewed

plaintiffs. He was also one of the officers taking Matt into custody. One report also states that O'Connor was the one who informed Matichak that Matt should be placed under arrest. Plaintiffs contend part of the cover up was omitting from the reports the information they stated to O'Connor. They also complain that the supervisory officers approved reports that contained omissions. Plaintiffs, however, were aware of what they told both O'Connor and Matichak so they would have been aware of the omission as soon as the reports were disclosed, which would have been before Matt's criminal trial in December 2006. They also would have been aware of other omissions as soon as they saw the police reports and, at the same time, would have been aware these three defendants acted in a supervisory capacity. More than one year before the limitation period expired, plaintiffs were aware that the reports they purportedly relied upon contained alleged omissions that allegedly would have been favorable to Matt's criminal case. Reasonable diligence would have enabled plaintiffs to bring claims against these defendants by December 2007. *See Mauer*, 926 N.E.2d at 963 (collecting cases including *Turner*, 689 N.E.2d at 310 ("fraudulent concealment exception did not apply where plaintiff should have discovered the alleged concealment through ordinary diligence eight months before the repose period elapsed")); *Aleman*,

2010 WL 502755 *4 (a plaintiff does not act with diligence by waiting until a couple months before the limitation period expires to file a case and then seeking to use the discovery process to determine the identity of those involved).

The claims against Heavener, O'Connor, and Corp will be dismissed on statute of limitation grounds except Count V. As to the remaining Count-I-through-IV defendants, evidence that they conspired with the supervisory defendants will still be considered to the extent it is material to the claims against the remaining defendants for those counts.[4]

### IV. Summary Judgment Facts

The facts taken as true for purposes of ruling on defendants' motions for summary judgment are as follows. On the evening of December 21, 2005, Matt and Vidano went shopping for a present for Matt's mother. Thereafter, Vidano dropped Matt at Ryan Phillipp's house while Vidano went to her home to wrap the present. Vidano was to return to pick up Matt. Matt left his coat in Vidano's car. When time passed without Vidano returning or answering her telephone, Matt became angry. When he reached Vidano, he spoke harshly and told her he no

---

[4]Even if the claims against the supervisors were not dismissed on statute of limitations ground, those claims would be dismissed for the same reasons that they are being dismissed as regards the other defendants.

longer wanted her friendship. At this point, Vidano was with Jason. Jason saw

Vidano's reaction and could also hear some of what Matt was saying. Jason either

took the phone in mid-conversation or called Matt using Vidano's telephone.

Jason told Matt not to talk to Vidano this way and that Matt didn't know who

Jason or his father was. Jason said he was going to find Matt, kick and beat the

shit out of him, and kick his fucking ass. He again made the point: "You don't

know who I am. You don't know who my father is."

At 11:22 p.m., Jason left the following message on Matt's cell phone

voicemail.

> Yes. Matthew fucking Rossetti; answer your fucking phone
> so I can find where you're at so I can kick your ass, or else I'm
> going to find you and fucking kill you, so you might as well
> just answer the phone because I'm going to fucking stick my
> dick in your mouth. So fucking answer the phone bitch. Bye.

Jason, who was 19 at the time, had been drinking alcohol. Shortly

before midnight, Vidano and Jason arrived at the Rossettis' house. Matt and

Phillipp were already there. At first Matt thought Vidano was by herself in her

car, but Jason was in the passenger seat. Vidano pulled her seat up so Matt could

reach in the back and get his coat and the present. When reaching to get the

present, Matt noticed Jason in the passenger seat and asked who he was. Jason

said, "I'm Jason Fucking Blatti," and punched Matt in the face, cutting him above the left eye. Eventually, Jason had Matt in a headlock, with Matt struggling to get out. In the altercation, Jason got a cut or abrasion on his neck.[5] Matt also had evident bruises and cuts. Matt was hanging from the car as Vidano began backing away. Phillipp and Mark were able to pull Matt out and Vidano drove away. During the altercation, Jason repeatedly made profanity-filled statements to the effect that: you don't know who I am; my father's a cop, you're going to jail, and I'm going to kill you.

After this first confrontation, Jason contacted two of his friends, Matt Dilday and Joseph Adler, and his uncle Matt Blatti ("Matt B."), who was then a Cook County Deputy Sheriff working as a correctional officer. Dilday and Adler were 19 and Matt B. was 23. Jason wanted to return to the Rossettis so he could beat up Matt, with the other three purportedly being there to ensure a "fair fight," since Phillipp and Mark were also at the Rossettis. The four men and Vidano went

---

[5]Jason testified that Matt bit him on the neck, but there is contrary evidence from which it can be inferred that the neck injury was a friction burn or caused by something other than a bite. However, Jason told officers he was bitten. To someone without medical training, the wound could have been identified as a bite. The doctor who treated Jason for a wound accepted his statement that it was a bite wound and treated it as such. The doctor testified that, without Jason's statement, he likely would not have concluded it was a bite wound.

to the Rossettis. Jason told the other three that Matt had initiated the first fight. Vidano stayed in the car while the four men walked onto or near the porch. Mark came out and met them on the porch. Mark's wife Jeanne and his children, Matt and Jessica, were in the house.

Jason and others screamed at Mark to get Matt outside so Jason could kick his ass. Jason threatened to kill Mark and his entire family if Matt did not come out. Mark told them to get off his property or he was going to call the cops. Matt B. said he was a cop, but would not show a badge. Jason told Mark that he would kill the entire family and, if necessary, come back the next day to kill Matt. He added, "My dad's a Joliet cop, I ain't fucking going nowhere, you're going to fucking jail." When the men did not leave, Mark ran past them and around their car. Mark yelled out the license plate number to his wife and told her to call 911. The four men heard him yell this. Jessica and Matt both called 911. The first call came in at 12:17 a.m., reporting that men in a white Chevy Malibu were threatening to beat them up. At least in part because they believed 911 was being called, the men decided to leave. None of them hit Mark or anyone else before leaving.

Jason returned home. His father was on duty, but home on his meal break. Jason told his father about the first confrontation with Matt. Evidence is inconsistent as to whether Jason called his father before arriving home and is also inconsistent regarding how much and what Jason told his father about the two incidents. Patrick contacted his supervisor, Heavener, regarding the incident. It can be inferred that Patrick was told enough to know that Jason may have engaged in criminal activity in making threats to the Rossettis during the second confrontation.

Matichak was the first to arrive at the Rossettis in response to their 911 call. He arrived shortly before 12:30 a.m. Initially, Mark made a comment about the police "buddy system." When told the incident involved Jason, Matichak turned white and said, "Sir, I don't want to lose my house, let me make a phone call." He then left the room. On this shift, O'Connor was Matichak's supervisor, but Matichak contacted Heavener, who was Patrick's supervisor for this shift and assigned to a different area of Joliet. Matichak used his personal cell phone to contact Heavener, not his police radio. At the time Matichak first called, Heavener was heading to Patrick's house in response to Patrick having contacted him. At some point, both Heavener and Patrick learned of Jason's second visit to

the Rossetti residence. They, as well as Matichak, were aware of possible criminal conduct by Jason. O'Connor was also contacted at some point and also went to the Rossettis to assist Matichak. He was also aware of possible criminal conduct by Jason. Patrick testified that Heavener told him there was a disagreement between Heavener and O'Connor as to whether or not to arrest Matt. Based on seeing Jason's injury and talking to Jason, Heavener wanted Matt arrested for battery. Purportedly, because of the disagreement between Heavener and O'Connor, they called in Lieutenant Corp.

Prior to O'Connor's arrival at the Rossettis, Matt told Matichak his version of the first confrontation. He told Matichak that Jason made threats over the telephone and in a voicemail, that Jason attacked him in Vidano's car, that Matt only defended himself, and that Jason had punched him over the left eye. Matt had visible injuries over his left eye. Mark also told Matichak what he had witnessed during the first confrontation, which supported Matt's version. This information was not included in either of Matichak's police reports.

O'Connor informed Matt that he would be arrested and Matichak actually placed Matt in custody. At the time, Matichak stated to Matt, "Listen, just

relax and go through the motions. Everything will be fine." Matt was placed under arrest at 1:12 a.m., approximately 45 minutes after Matichak first arrived.

After Corp ordered that Matt be arrested, Jason was taken to the hospital for treatment of his injury. Wascher came to the hospital and interviewed both Jason and Vidano. Wascher was aware that Jason was Patrick's son and was aware there had been two incidents. Wascher followed Heavener's instruction to limit her report to the first battery incident. Heavener approved the report. He did not add anything to it about his interviewing of Jason at his residence or anything about his discussions between him, Corp, and Patrick at the Blatti residence. After interviewing Jason and Vidano, Wascher went to the police station and interviewed Matt, which she also summarized in her report. The report omits that Matt told her that Jason left the threatening voicemail, that Jason had Matt in a headlock and Matt only hit at him to try to get free, and that he never bit Jason.

Before submitting her report, Wascher called the State's Attorney's Office and received approval to charge the case as a felony. The cited evidence,

Wascher Dep. 81, 88, 91,[6] though, does not detail what facts Wascher provided to the assistant State's Attorney other than that there was a bite.

A bond hearing was held on December 22, 2005 at which Matt was represented by retained counsel. Matt waived a hearing as to probable cause to detain him. Matt was released on bond subject to special conditions. The State's Attorney subsequently reduced the charges to simple battery. Matt was acquitted.

Jason made statements to police officers admitting that he went to the Rossettis and made threats. Those statements are not recorded in any police report. When Matichak was arresting Matt, Mark informed him he wanted to press charges against Jason. Matichak told him he would return to arrange that. Matichak returned and had Mark sign a form that he told him was a "complaint." No officer followed up on this form. Jason was never arrested nor charged with any offense related to the two confrontations.

---

[6]Defendants also cite to the deposition testimony of assistant State's Attorney Jessica Colon-Sayre. Colon-Sayre, however, does not recall her conversation with Wascher or even approving the felony charges. Her testimony is limited to being based on reading the police reports and offering her present opinion based on the information stated therein.

### V. Count II:  False Arrest

The question is whether probable cause existed to arrest Matt for any offense.  Consideration is not limited to the aggravated battery charge on which Matt was initially charged.  ***Fox v. Hayes***, 600 F.3d 819, 837 (7th Cir. 2010). Defendants contend Count II fails because there was probable cause to arrest plaintiff for battery because Jason had visible injuries and provided information that Matt attacked him.  Jason, Patrick, and Wascher also contend this claim fails as to them because there is insufficient evidence they conspired with the officers responsible for the arrest.  As to each of the federal claims, Jason contends the claim fails because he was not acting under color of law.  That argument turns on whether there was sufficient evidence that Jason conspired with one or more of the police officers.  The defendants, other than Jason, alternatively invoke qualified immunity.

Matt does not dispute that the information provided by Jason, standing alone, would ordinarily be sufficient to constitute probable cause for arrest and therefore defeat Count II.  Instead, he contends that other information that defendants had undercuts probable cause and that the investigation was not in good faith.

Probable cause exists if "at the time of the arrest, the facts and circumstances within the officer's knowledge are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Gonzalez v. City of Elgin*, 578 F.3d 526, 537 (7th Cir. 2009) (citing *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979)). Probable cause requires only that a probability or substantial chance of criminal activity exists; it does not require the existence of criminal activity to be more likely true than not true. *See Purvis v. Oest*, 614 F.3d 713, 722-23 (7th Cir. 2010); *Mannoia v. Farrow*, 476 F.3d 453, 457 (7th Cir. 2007). In evaluating probable cause, we look only to the information known to the officer at the time of arrest, and we view the circumstances of the arrest from the perspective of a reasonable person in the position of the officer. *Gonzalez*, 578 F.3d at 537.

*Mucha v. Vill. of Oak Brook*, __ F.3d __, 2011 WL 489617 *3 (7th Cir. Feb. 14, 2011).

Regarding the adequacy of the investigation undertaken prior to effecting an arrest:

The law gives a police officer latitude to make reasonable judgments in light of the circumstances. While an officer may not close his or her eyes to clearly exculpatory facts, the Fourth Amendment does not require an officer with probable cause to arrest to wait while pursuing further investigation. . . . In some situations, an officer may be required to conduct some investigation before making an arrest; in others, an officer may have probable cause for arrest without any need for investigation. Relevant factors include the information available to the officer, the gravity of the alleged crime, the

- 21 -

danger of its imminent repetition, and the amount of time that has passed since the alleged crime.

*Stokes*, 599 F.3d at 624-25. *See also **Guzell v. Hiller***, 223 F.3d 518, 520 (7th Cir. 2000); ***Reardon v. Wroan***, 811 F.2d 1025, 1028 (7th Cir. 1987).

Matt contends Jason and the officers are so lacking in credibility that, despite their testimony to the contrary, it should be assumed that Jason actually told his father, Heavener, Corp, and/or Wascher that he was the one who initiated the fight during the first confrontation. Matt also contends that Jason's version of the initial fight is itself incredible in that it is uncontested that Matt entered the car from the driver's side instead of the side Jason was on and because Jason and Vidano initially stated that Matt reached behind Vidano to hit Jason, but that is not an incredible version of events. As Matt has testified, he did not initially see Jason was in the car and could have become incensed after reaching for the items in the backseat and then spotting Jason. For purposes of defendants' summary judgment motion, it is accepted that Jason told the officers at his house that he instigated the second confrontation and his father and the other officers were seeking to assist him in avoiding criminal charges for that conduct, but there is not a sufficient basis to take as true that he told the officers he started the first fight. It

would be consistent with seeking the help of first his friends and uncle, and then

his father and the other officers, to paint himself as the initial victim.  Also, it is

consistent with his present testimony, under oath, as to what happened.  Misstating

events to friends, family, and police officers is behavior consistent with again

misstating the events under oath in a judicial proceeding.

For purposes of summary judgment, it is taken as true that the officers

were willing to assist Jason[7] and that Matt informed Matichak (and after his arrest,

Wascher) of his version of the first confrontation, which was corroborated by his

father.  It is also taken as true that the officers were aware of Jason's version of the

fight in the car, and that Jason had previously made threats over the telephone.

The officers were not compelled to believe Matt instead of Jason as to who

initiated the first blow.  The information before them was sufficient to support

probable cause to arrest either (or possibly both) of those involved in the fight

depending on the extent each person was to be believed.  It is not a question of the

---

[7]There is support for this in the evidence that the police reports omitted
information favorable to Matt and unfavorable to Jason, and made no mention of
the second confrontation in the reports concerning the first confrontation.
Inconsistencies in the officers' testimony provides further support.

investigation of the first confrontation being incomplete.[8] Even if the information

was not included in the police reports, Matt and his father had been interviewed

and, consistent with plaintiffs' theory of the case, it is being inferred that Matichak

had informed O'Connor and that O'Connor had passed on at least a summary of

their statements to Heavener and Corp. Vidano was not interviewed before the

arrest, but shortly thereafter she provided a statement supporting Jason's version.

Phillipp was the only one present at the fight who was not interviewed. Matichak

had already heard from Matt and his father. Phillipp's statement would only have

been cumulative. Matt also contends there was no need to immediately arrest him

because the fight had occurred earlier and he did not represent a continuing threat.

The first fight, though, had occurred about one and one-half hours before Matt's

arrest and the officers were aware there had been a further confrontation. Even

though the information provided was that Jason had initiated the second

---

[8]The investigation of the second confrontation may have been
incomplete, but a false arrest claim based on the second confrontation cannot be
made because no arrest was made based on that incident. Moreover, the second
confrontation is only peripherally relevant to whether Matt committed battery at
the first confrontation. If Matt committed battery during the first confrontation,
that remains true even if Jason (and others) thereafter engaged in criminal conduct
by returning to the Rossettis and engaging in threatening conduct. The second
confrontation is only relevant to the first confrontation to the extent it goes to the
credibility of witnesses or to the limited extent inferences as to what happened at
the first confrontation can be drawn from conduct at the second confrontation.

confrontation, the officers had a reasonable basis for fearing further confrontations being initiated by either side.

Even taking into account the Rossettis' statements, a reasonable officer could have chosen to believe Jason, including by taking into account that he appeared to have more bruising and cuts than Matt. *See McBride v. Grice*, 576 F.3d 703, 707-08 (7th Cir. 2009) (victim's testimony that she was hit in head and visible swelling and scratch supported probable cause to arrest for battery); *Zitzka v. Vill. of Westmont*, ___ F. Supp. 2d ___, 2010 WL 3863237 *16 (N.D. Ill. Sept. 28, 2010) (bruises on putative victim supported probable cause that arrestee committed battery and that he was not acting in self-defense). *See also Jenkins v. Nelson*, 157 F.3d 485, 499 (7th Cir. 1998) (bruises are evidence supporting a battery); *People v. Wydra*, 265 Ill. App. 3d 597, 637 N.E.2d 741, 748-49 (1st Dist. 1994) (scratches are evidence supporting a battery and do not require medical testimony to support that they are sufficient injury to meet bodily harm requirement of aggravated battery). Since the officers had conducted a sufficient investigation and sufficient facts existed to support probable cause to arrest Matt, there is no cognizable false arrest claim.

Citing *dictum* in ***Jackson v. City of Moline***, 2006 WL 1554075 *20 (C.D. Ill. June 1, 2006), plaintiffs assert that the probable cause determination assumes a good-faith investigation by the police officers. As discussed above, there is evidence supporting that the officers acted with the intention of protecting Jason from being arrested for his conduct during the second confrontation. Such a motivation, however, is irrelevant to a false arrest claim. Probable cause is an objective standard based on the information known to the officer at the time of the arrest. ***Devenpeck v. Alford***, 543 U.S. 146, 153 (2004); ***United States v. Garcia-Garcia***, ___ F.3d ___, 2011 WL 206153 *6 (7th Cir. Jan. 25, 2011); ***Jackson v. Parker***, 627 F.3d 634, 638 (7th Cir. 2010); ***Carmichael v. Vill. of Palatine, Ill.***, 605 F.3d 451 (7th Cir. 2010). "[A]n arresting officer's state of mind (except for the facts that he knows) is irrelevant to the existence of probable cause." ***Devenpeck***, 543 U.S. at 153. An arrest is not invalid because the arresting officer was maliciously motivated. ***Id.*** at 154; ***Mucha***, 2011 WL 489617 at *3. "Subjective intent of the arresting officer, *however* it is determined (and of course subjective intent is *always* determined by objective means), is simply no basis for invalidating an arrest. Those are lawfully arrested whom the facts known to the arresting officers give probable cause to arrest." ***Devenpeck***, 543 U.S. at 154-55.

*See also Jackson*, 627 F.3d at 638; *Carmichael*, 605 F.3d at 457; ***Mustafa v. City of Chicago***, 442 F.3d 544, 547 (7th Cir. 2006).

The investigation evidence does not show that probable cause did not exist to arrest Matt. Because the alleged constitutional violation did not occur, for purposes of resolving Count II, it is unnecessary to determine whether Jason acted under color of law based on acting in concert with state actors.

## VI. Count I:  Retaliatory Arrest

Count I is based on alleged retaliation for exercising the First Amendment right to call 911. All three plaintiffs make this claim. The alleged retaliation was arresting Matt. To make out a *prima facie* case of a retaliatory arrest, plaintiffs must establish that they engaged in protected speech[9] and that the speech was a motivating factor in defendants' retaliatory act. If plaintiffs meet that burden, defendants can defeat the claim by demonstrating they would have taken the same action absent the protected speech. If defendants make such a showing, plaintiffs must show that the reasons are pretextual. *See **Morfin v. City of East Chicago***, 349 F.3d 989, 1005 (7th Cir.2003); ***Valentino v. Vill. of S. Chicago Heights***, 575 F.3d 664, 670 (7th Cir. 2009); ***Brown v. City of Fort Wayne***,

_____

[9]Defendants do not contend that reporting criminal activity to 911 or directly to police officers is not protected speech.

___ F. Supp. 2d ___, 2010 WL 4630518 *20 (N.D. Ind. Nov. 4, 2010);[10] *Webb v. Lanton*, 2010 WL 2102416 *5 (N.D. Ill. May 18, 2010). Defendants contend Count I fails because evidence does not support that Matt's arrest was motivated by retaliation for making the 911 call.

Defendants also contend that the existence of probable cause for an arrest defeats a claim for retaliatory arrest, citing *Hartman v. Moore*, 547 U.S. 250 (2006), which involves retaliatory prosecution not retaliatory arrest. Plaintiffs do not address the legal question of whether the existence of probable cause bars their Count I First Amendment claim; they only respond that probable cause did not exist. The Supreme Court and the Seventh Circuit have not reached the issue of whether probable cause defeats a retaliatory arrest claim. District court cases in the Seventh Circuit have split on the issue, but a majority have held probable cause defeats a retaliatory discharge claim. *See Brown*, 2010 WL 4630518 at *21

---

[10]*Brown* also includes as an element that the retaliatory conduct would deter First Amendment activity in the future. That is ordinarily an element of a First Amendment retaliation claim. An arrest, however, is conduct that would always satisfy that element and defendants do not contend otherwise. Jason asserts that Mark and Jessica cannot base their retaliation claim on the arrest of Matt. The arrest of a close relative, however, may deter speech; the speaker him/herself need not be the one arrested in order to bring a retaliatory arrest claim. *See McKenna v. City of Philadelphia*, 2008 WL 4450223 *8 (E.D. Pa. Sept. 30, 2008), *aff'd*, 582 F.3d 447 (3d Cir. 2009).

(collecting cases); *Zitzka*, 2010 WL 3863237 at \*24 (probable cause does not defeat retaliatory arrest claim). Courts of Appeal that have reached the issue have applied a probable cause requirement to retaliatory arrest claims, *see McCabe v. Parker*, 608 F.3d 1068, 1079 (8th Cir. 2010); *see also Everson v. Calhoun Cty.*, __ F. App'x ___, 2011 WL 204453 \*3 (6th Cir. Jan. 24, 2011) (unpublished); *Wood v. City of Garden Grove*, 395 F. App'x 467, 469 (9th Cir. 2010) (unpublished); *see also Williams v. City of Carl Junction, Mo.*, 480 F.3d 871, 876 (8th Cir. 2007) (probable cause precluded First Amendment retaliation claim based on the issuance of municipal citations); *Barnes v. Wright*, 449 F.3d 709, 720 (6th Cir. 2006) (probable cause defeated false arrest claim against police officers based on officers obtaining an arrest warrant by presenting evidence directly to grand jury).

As previously discussed, there is evidence to support that the Joliet defendants were motivated by a desire to prevent any arrest of or charges against Jason. Any charges against or arrest of Jason could, in part, have been initiated based on plaintiffs reporting the second confrontation during the 911 call and the information Matt and Mark provided to Matichak and O'Connor. It can be inferred that Matt's arrest was motivated, at least in part, by a desire to avoid

charges against Jason. That, however, is not the same as a retaliatory animus for making the 911 report. At best, a retaliatory animus is indirectly connected to such a motivation in that there would be no effort to avoid charges against Jason if information about the second confrontation had not been conveyed, which happened to initially occur in a 911 call. As the Ninth Circuit held in *Dietrich v. John Ascuaga's Nugget*, 548 F.3d 892, 901 (9th Cir. 2008) the existence of probable cause should weigh heavily against finding causation is satisfied. Plaintiffs' weak evidence of a causal connection between calling 911 and arresting Matt is overcome by the existence of probable cause. Alternatively, this court would follow other cases holding that the existence of probable cause is a bar to a retaliatory arrest claim. *See Trepanier v. City of Blue Island*, 2008 WL 4442623 *7-8 (N.D. Ill. Sept. 29, 2008), *aff'd by unpublished order*, 364 F. App'x 260 (7th Cir. 2010); *Baldauf v. Davidson*, 2007 WL 2156065 *3-4 (S.D. Ind. July 24, 2007). Count I will be dismissed.[11]

---

[11]Because Count I is being dismissed on other grounds, it is unnecessary to determine whether Jason and Wascher acted in concert with those effecting the arrest.

## VII. Count III:  Class of One

Count III is Matt's class of one claim.  To succeed on this claim, Matt "must establish that (1) a state actor has intentionally treated him differently than others similarly situated, and (2) there is no rational basis for the difference in treatment." *Reget v. City of La Crosse*, 595 F.3d 691, 695 (7th Cir. 2010); *accord LaBella Winnetka, Inc. v. Vill. of Winnetka*, 628 F.3d 937, 942 (7th Cir. 2010). Seventh Circuit case law is unclear as to whether a showing of an illegitimate animus is also a required element or it is instead an alternative means of satisfying the no-rational-basis element. *Reget*, 595 F.3d at 695.  "To be considered 'similarly situated,' a plaintiff and his comparators . . . must be identical or directly comparable in all material respects. *Reget*, 595 F.3d at 695.  The 'similarly situated' analysis is not a 'precise formula,' but we have stated repeatedly that what is 'clear [is] that similarly situated individuals must be very similar indeed.' *McDonald v. Vill. of Winnetka*, 371 F.3d 992, 1002 (7th Cir.2004)." *LaBella*, 628 F.3d at 942.  Defendants contend Matt does not satisfy the similarly situated requirement and that he does not provide sufficient evidence of an illegitimate animus.

Matt contends Jason was similarly situated to him, but not arrested. As previously discussed, the facts presently before the court are that defendants had information supporting probable cause that Matt, Jason, or both committed battery on the other. When faced with conflicting statements implicating one person or the other, a police officer is not precluded from exercising his or her discretion in determining which statements to credit or else be subject to a class-of-one claim by the one arrested. In such situations, the officer may exercise his or her discretion and arrest one person without being subject to a class-of-one claim. *See Engquist v. Ore. Dep't of Agric.*, 553 U.S. 591, 603-04 (2008) (class-of-one violation does not apply to "discretionary decisionmaking based on a vast array of subjective, individualized assessments," for example, it would not preclude a police officer from choosing to ticket one of many speeders passing by on a busy highway). The Seventh Circuit, though, has held that, when an officer makes an arrest based on malice alone, he or she is not exercising discretion and is not protected by this rule. *Hanes v. Zurick*, 578 F.3d 491, 496 (7th Cir. 2009).

Here, Matt and Jason were not similarly situated. Both were accused by the other of initiating the fight. Beyond that, however, one person was initially in the car and the other entered it. Jason's injuries appeared more severe than Matt's.

There were also varying statements as to the threats and statements each had made before the fight occurred. But, even assuming the two were similarly situated, this is not a situation in which the evidence supports that any of the Joliet officers acted purely based on malice and without the exercise of discretion. As previously discussed, there was sufficient evidence supporting probable cause to arrest Matt. Matt does not make out a class-of-one claim based on Jason being the similarly situated comparator.

Alternatively, Matt points to Phillipp, who was not arrested, as being similarly situated. Phillipp was not similarly situated. The extent of Phillipp being implicated in the fight is the allegation that he assisted Matt by pulling Jason's fingers off of Matt. Even assuming the officers were aware of that accusation, an abettor providing some assistance is not similarly situated to the principal engaging in a battery.

Count III will be dismissed.

### VIII. Count V: Due Process *("Brady")*

Count V is Matt's due process claim that he was denied a fair trial based on evidence withheld by defendants in violation of ***Brady v. Maryland***, 373 U.S. 83 (1963). While the rule stated in ***Brady*** is

most commonly viewed as a prosecutor's duty to disclose to the defense, the duty extends to the police and requires that they similarly turn over exculpatory/impeaching evidence to the prosecutor, thereby triggering the prosecutor's disclosure obligation. *See Youngblood v. West Virginia*, 547 U.S. 867, 870 (2006) ("[A] Brady suppression occurs when the government fails to turn over even evidence that is 'known only to police investigators and not to the prosecutor ....'" (citing *Kyles v. Whitley*, 514 U.S. 419, 438 (1995))); *Strickler v. Greene*, 527 U.S. 263, 280-81 (1999); *Steidl v. Fermon*, 494 F.3d 623, 628, 630-32 (7th Cir. 2007). A *Brady* violation can be broken down into three basic elements: (1) the evidence at issue is favorable to the accused, either being exculpatory or impeaching; (2) the evidence must have been suppressed by the government, either willfully or inadvertently; and (3) there is a reasonable probability that prejudice ensued--in other words, "materiality." *See Youngblood*, 547 U.S. at 869-70; *United States v. Bland*, 517 F.3d 930, 934 (7th Cir. 2008); *Ienco v. Angarone*, 429 F.3d 680, 683 (7th Cir. 2005). Evidence is "suppressed" when (1) the prosecution failed to disclose the evidence in time for the defendant to make use of it, and (2) the evidence was not otherwise available to the defendant through the exercise of reasonable diligence. *Ienco*, 429 F.3d at 683. Evidence is "material" "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Strickler*, 527 U.S. at 280 (internal quotations omitted); *see also Bland*, 517 F.3d at 934.

*Carvajal v. Dominguez*, 542 F.3d 561, 566-67 (7th Cir. 2008). When the plaintiff was acquitted in the criminal proceeding, to the extent there is still a viable civil *Brady* claim, the materiality requirement can be satisfied by establishing a

reasonable probability that the decision to go to trial would have been altered if the evidence at issue had been disclosed, that is the prosecution would not have moved forward with charges, the defendant would not have been indicted, or the trial court would have granted a motion to dismiss. *Mosley v. City of Chicago*, 614 F.3d 391, 397 (7th Cir. 2010).[12]

Matt contends the prosecution would not have proceeded to trial if not for the failure to disclose. He identifies the following undisclosed evidence as affecting the prosecution's trial decision.

> [I]f the prosecutor would have discovered that Heavener concealed the existence of statements he took from Jason and Patrick Blatti, and directed Wascher to prepare a report totally silent in reference to his investigation, as well as the 911 call and the facts leading up to it, it is a reasonable probability that the prosecutor would have terminated the prosecution much earlier. Likewise, if the prosecutor would have learned, as the totality of the facts suggest is a reasonable inference here, that Jason Blatti did not tell his father he was the victim of any battery, and that Jason's father and Heavener put Jason up to claiming he was a victim because they needed an excuse to deflect criminal liability away from him for the multiple felonies that he committed that night, it is a reasonable

---

[12]In a number of cases, the Seventh Circuit has assumed this is the applicable standard without expressly deciding whether a civil *Brady* claim exists for someone who is acquitted. *See Mosley*, 614 F.3d at 397-98; *Posey v. Pruger*, ___ F. Supp. 2d ___, 2011 WL 43502 *6 (N.D. Ill. Jan. 3, 2011).

probability that the prosecutor would have terminated the prosecution much earlier. Likewise, if the prosecutor knew that Patrick Blatti and Heavener argued with O'Connor because O'Connor did not believe that probable cause existed, it is a reasonable probability that the prosecutor would have terminated the prosecution much earlier. Likewise, had the prosecutor known that Patrick Blatti, Heavener, O'Connor and Corp had conflicting accounts of whether probable cause existed, and why Corp was called in, it is a reasonable probability that the prosecutor would have terminated the prosecution much earlier. Finally, had the prosecutor known that Jason Blatti initially withheld information from his father that the Rossettis called 911 (if this version is to be believed), it is a reasonable probability that the prosecutor would have terminated the prosecution much earlier.

Pl. Br. [157] at 31.

Plaintiff does not point to evidence of any information that is sufficient to support his *Brady* claim. *Brady* only applies to the disclosure of admissible evidence. *United States v. Salem*, 578 F.3d 682, 686 (7th Cir. 2009). The officers' beliefs as to probable cause to arrest Matt would not have been admissible at his trial. Even if this "evidence" is information pertinent to a civil *Brady* claim following an acquittal, it is not information likely to affect the decision to go to trial. The existence of probable cause to arrest is not pertinent to guilt at trial. Pertinent to the trial decision is whether the evidence available to the prosecution

is adequate to obtain a conviction. Regardless of the officers' beliefs regarding probable cause, the prosecutor would have made his own evaluation of the strength of the case. Even if probable cause was an issue, again, the prosecutor would have made his own independent evaluation of the evidence.

As to the police reports of the battery omitting mention of information provided by the Rossettis, Jason's threats, and the second confrontation, Matt was well aware of that information. Matt could have (and may have)[13] pointed out this information to the prosecutor, and would have had the voicemail recording of the threatening message left by Jason. Since this information was available to Matt, he cannot assert a **Brady** claim. **Carvajal**, 542 F.3d at 567; **Ienco**, 429 F.3d at 683.

Since plaintiff has not provided proof of material evidence that was withheld, Count V will be dismissed.[14]

---

[13]The record contains excerpts of the deposition of the assistant who tried the criminal case. Plaintiff does not point to any testimony of the prosecutor to support his contention that any of this information would have affected the prosecutor's decision to go to trial.

[14]Again, it is unnecessary to reach the question of whether there is sufficient evidence that Jason acted in concert with the officers.

## IX. Count IV:  State Law Malicious Prosecution

The one remaining claim is Matt's state law malicious prosecution claim.  Since this case involved extensive discovery, the summary judgment motion has been briefed, and the factual and most legal issues as to malicious prosecution are closely related to the federal claims, the court will retain jurisdiction over this claim in order to resolve that aspect of the summary judgment motions.  Under Illinois law, which the parties agree applies to this claim, the malicious prosecution claim fails because, as previously held, the undisputed facts support that probable cause existed for plaintiff's arrest. *Mannoia*, 476 F.3d at 459.  Count IV will be dismissed.

IT IS THEREFORE ORDERED that plaintiffs' motion to deem facts admitted [181] is granted.  Defendants' motions for summary judgment [138, 143] are granted.  The Clerk of the Court is directed to enter judgment in favor of defendants and against plaintiffs dismissing plaintiffs' cause of action with prejudice.

ENTER:

_William T. Hart_
UNITED STATES DISTRICT JUDGE

DATED:  MARCH 3 , 2011